### F. BELDEN AND ANOTHER v. PETER DOWD.

1—Purchasers of land from H. were informed by him, at and before their pur-
chase, that D. claimed the land, but that he had no title, as he had failed
to comply with his contract with the original grantee, under whom all
parties claimed. Before the sale by H., both he and D. had received con-
veyances from the original grantee, but the conveyance to D. was the
oldest, and H. knew that D. claimed the land when he, H., received his
conveyance. The conveyance to D. was not of record when H. sold the
land. *Held*, that H. and his vendees, when they respectively took their
conveyances, were purchasers with actual notice of the rights of D., and
that the latter was entitled to recover the land from them.

APPEAL from Nueces. Tried below before the Hon. Edmund
J. Davis.

Peter Dowd, the appellee, brought this action of trespass to
try title, to the Spring term, 1857, against F. Belden and
Henry A. Gilpin, the appellants.

The material facts are clearly stated in the opinion of the
court, but in order to bring out more fully the information
derived by the defendants from Haynes, their vendor, and from
other sources, it seems advisable to extract from the evidence
at the trial below.

John L. Haynes testified : " Dowd did set up a claim to the
land before the transfer to defendants. ＊　＊ When I sold
the land to the defendants, I told them that Dowd held a bond
for title to the land, but that he had failed and refused to com-
ply with the conditions of his contract with Farias, and that
his claim was worthless and void, and I made to Mr. Gilpin an
explanation of the contract between Dowd and Farias, as fol-
lows : In 1850–51, when the board of commissioners to inves-
tigate land titles west of the Nueces was in session at this
place (Rio Grande City), Maximo Farias and his brothers
desired to present their titles, covering fifteen leagues of land,
for investigation. but did not have the means to do so. They

made a contract with Dowd, the plaintiff in this case, to present their titles to the board, to pay the fee, to pay the lawyers' fees, surveying fees, patent fees, and all other costs necessary to perfect their titles and obtain their patents, save the taxes on the lands, which were to be paid by the Farias, and upon obtaining their patents they were to make him a title to the two league tract called the Presenos de Ariba.

"Dowd fully understood the expenses he was to incur, because Mr. E. R. Hord had nearly agreed to incur them for one league of the land, but upon a calculation of the surveys, patent fees and expenses, he declined to do so, and then Dowd, being present, offered to pay all these expenses for the two league tract : with which offer Farias closed, Hord, myself and others being present and witnesses. Dowd paid the board the investigation fee, $90, which was every cent he had ever paid on the land, although he had been often requested by Farias and his family to complete his contract, which he positively refused to do unless they would give him an additional amount of land. The parties, upon Dowd's refusal to complete his contract, made me their agent and attorney, and gave me two and a half leagues of land to perfect their titles. Knowing that Dowd had failed and refused to comply with his contract, I advised Farias to sell the land, which he agreed to do, and I became the purchaser. It was for the reasons herein set forth that the defendant, Mr. H. A. Gilpin, became satisfied that Dowd's claim was invalid, and not, I think, because Dowd's title bond was not recorded in Nueces county."

It does not appear that Haynes informed the defendants, or that he was himself apprised, of the deed by Farias to Dowd of November 26th, 1852, which was subsequent to the legislative confirmation of the grant.

Israel Bigelow testified that Gilpin told him that they, the defendants, knew of the existence of the first agreement between Farias and Dowd.

Reuben Holburn testified : " The defendants, while negotiating with Haynes for the lands in controversy, applied to wit-

ness to know about the quality of the lands and the titles. Witness gave them information as to the quality and situation of the lands, and at the same time mentioned Dowd's claim; but this was spoken of as being a contract not complied with and unjust."

The court below, at the request of the plaintiff, instructed the jury as follows: "If from the evidence the jury shall find that the defendants had notice of any claim by the plaintiff to the lands in question, at or before the acquiring of such title, then it was the duty of the defendants to have applied to the plaintiff as the best and proper source from which to inform themselves of the nature and character of said plaintiff's claim; and if in this case the defendants did not avail themselves of this means of information, they are bound by the full extent of the plaintiff's title in said lands."

In the charge of the court to the jury, they were further instructed, in substance, that the absolute deed made by Farias to Dowd in November, 1852, after the confirmation of the titles, unless it was obtained by fraud, in connection with the notice had by the defendants, entitled the plaintiff to a verdict.

The defendants asked the court to instruct the jury, in substance, that there was no evidence fixing notice on defendants of Dowd's deeds, nor putting them upon inquiry as to his claim to the land, and further instructions respecting the fairness of Dowd's deeds. The court refused the instructions asked by the defendants, and they excepted.

Sundry instructions asked by the plaintiff were also refused by the court.

The jury returned a verdict for the plaintiff, and he had judgment for the lands. The defendants moved for a new trial, which was refused, and they appealed.

*Allen & Hale*, for appellant.—But even if the deeds were valid, they were not recorded in Nueces county, where the land was situated, and were not, therefore, valid against subsequent purchasers, without notice, and for a valuable consideration.

(Act of February 5, 1840, § 1; Oldham & Wh., Art. 201.)   It is not contended by the plaintiff that the defendants had *actual notice* of the deed of November, 1852; nor that he, the plaintiff, had ever held possession of the land, or done any public act asserting his right or claim.   It is only contended that the defendant had notice, by conversation with Haynes and Blucher, of the fact that Farias had made with the plaintiff sometime before an agreement to convey this land upon the plaintiff having certain other land confirmed and surveyed; and that having this notice, it was the duty of defendants to have applied to the plaintiff for information, and then they *would* have learned the fact of the execution of the deed of November, 1852; and the argument is that they are therefore chargeable, by construction, with notice of all that they might thus, by proper prudence, have discovered.

To this we reply: First, that a statute is to receive a stricter construction than a mere rule or general practice in equity; that the policy of this statute was to compel registration; that it is not to be considered merely as a declaration of what was formerly an equitable rule, but as a substantive, positive enactment, introducing an absolute requirement, and intended to receive a construction to support and not to weaken it.

As the object of the act of 1840 is to enforce registration, the exception should be construed so as to carry out the main design.   If notice to purchasers will dispense with registration, then that notice should be clear, positive, actual.   Of course it may be proved by circumstantial evidence; but it must, however proved, be actual notice of the unregistered deed itself.   "Not having notice *thereof*" are the words of the statute. The former equitable idea that "putting on inquiry" brought home constructive notice of what would have been discovered by inquiry, is not the idea or meaning of the act; and to force that qualification upon the clear words of the law, is to cripple it and destroy its effect.   (2 White & Tudor's Cases, part 1, pp. 165, 174, and cases cited.)

Second. The cases where, both in England and America,

constructive notice has been discussed on the cases of the old equity rules, show very clearly that the principle is *not* that a purchaser is bound by all that a *prudent* man would have discovered by inquiry after notice of a collateral or incidental fact, but that if he *willfully* and fraudently, or by gross negligence, turns away from and disregards notices of facts which necessarily imply the existence of the unrecorded deed itself, he will be held bound. (Story Eq. Jur., §§ 395–9 ; Jones v. Smith, 1 Hare, 43 ; 1 Phill. Eng. Ch. R., 244 ; 2 Spence Eq. Jur., 754–9 ; Ware v. Egmont, 31 Eng. Law and Eq. R., 91 ; Dey v. Dunham, 2 Johns. Ch., 189 ; Barnes v. McClenlon, 3 Penn. R., 69 ; Rogers v. Jones, 8 New Hamp., 264 ; Agent-bright v. Campbell, 3 Hen. and Minn., 170 ; Peebler v. Reading, 8 Serg. and R., 495 ; Scott v. Gallagher, 14 Serg. and R., 333 ; Hughrow v. Mandeville, 4 Dess., 87.)

And consequently when the purchaser has been merely informed that another deed or title bond had once been made, but was invalid or annulled by subsequent action, he is not guilty of negligence in taking both statements together and inquiring no further. (Bullrick v. Holden *et als.*, 13 Met. 356 ; 2 Spence Eq. Jur., 755 ; Wilson v. Wall, 6 Wallace, 83, and cases cited above.)

In the present case, the defendants were not guilty of gross negligence, nor did they designedly refrain from obtaining information. They simply acted on *all* that was told them, believing as well that the agreement between Dowd and Farias had terminated, as that it once existed. They had, therefore, no constructive notice of the deed to Dowd of November, 1852.

Third. But it will be said that they had equal notice of the title, bond or deed of July, 1851, and that they therefore knew of Dowd's original interest and bought subject to it. We reply that if they knew of this bond, they knew by the same authority that it was without consideration and worthless. They did not know of it as a *present and actual* encumbrance, and therefore had no legal notice of its existence at all.

But a further reply is, that the plaintiff's action is not

founded on the bond of 1851, nor is the notice of that the point in issue. In his amended petition he speaks of the bond of 1851, exhibit A, as "the preliminary agreement," and says that by virtue of the deed of 1852, exhibit B, he acquired "the full, complete and equitable title to the lands in controversy," thus clearly relying on the latter for title.

The plaintiff contends that the defendants were not purchasers for a valuable consideration, because the purchase money was only partly paid. The sale by Haynes to them was for $500 cash and their negotiable promissory note at twelve months for $630. The note was indorsed to Farias for value, and collected afterwards by E. R. Hord.

A purchaser will be protected when only a part of the purchase money has been paid, before full notice (2 White & Tudor, part 1, pp. 112–116); and the taking a negotiable note is the receipt of money, (Tuttle v. Mayo, 7 Johns. R., 132,) and *prima facie* payment. (Isley v. Jewett, 2 Met., 173.)

*Pryor Lea*, for the appellee, cited, on the question of notice to the defendants of the plaintiff's rights, the following authorities: 6 Wendell, 213; 4 Wend., 585; 6 Cowen, 120; 17 Cowen, 25; 10 Peters, 177; 7 Sumner, 506; 9 Peters, 86; 2 Hill Ch., 421; 2 Bibb, 94; 8 Paige, 182; 2 Paige, 202; 4 Cowen, 717; 1 Sandford, 244; 1 Dev. & Bat., 182; 1 J. J. Marshall, 399; 6 Wallace, 719 to 723; and 6 Wallace, 715, 716.

WALKER, J.—Jose Maximo Farias and two brothers were the holders of a Spanish grant for about fifteen leagues of land, situated along the Nueces river. They were anxious to have the Legislature of the State confirm their title, and, accordingly, they entered into an agreement with Peter Dowd to act as their solicitor, or agent, to procure the necessary legislative sanction, and in consideration of Dowd's services and moneys paid out by him, Farias agreed to make him title for certain two leagues of the land known as Los Presinos de Ariba. On the 1st day of July, 1851, Jose Maximo Farias made Dowd a

XXXII—34

deed for said two leagues, which also contained a bond for further assurance of title, whenever the Legislature should have confirmed the title to the Spanish grant. The grant of the Farias family was confirmed by an act of the Legislature, passed February 10th, 1852, and on the 26th of November, 1852, Jose Maximo Farias made a full and complete title to Dowd of the Presinos de Ariba land. These titles Dowd neglected to record, and on the 20th of December, 1853, Farias sold and deeded the same land to John L. Haynes, and on the 25th of the same month and year Haynes sold and conveyed the land to Belden & Gilpin.

There can be no doubt, from the evidence of Haynes himself, of his knowing all about the claim of Dowd to the land in question before he made his purchase, and there is scarcely less doubt that Belden and Gilpin knew as much. The record discloses much more than constructive notice to them. They made inquiry of Haynes himself, and he told them of Dowd's claim to the land, but disparaged it by saying that Dowd had not complied with the conditions on which Farias was to deed him the land. Both parties claim title under Jose Maximo Farias, and we think, with the jury and court below, that Dowd's is the better title of the two. The judgment of the District Court is accordingly affirmed.

Affirmed.